DECISION
{¶ 1} Relator, Susan E. VanCleave, has filed an original action requesting that this court issue a writ of mandamus ordering respondent, School Employees Retirement System ("SERS"), to vacate its decision denying her application for disability retirement under R.C. 3309.39, and to enter a decision granting said application.
 {¶ 2} The matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. On August 16, 2007, the *Page 2 
magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.)
 {¶ 3} Relator has filed objections to the magistrate's decision, making the same arguments raised before the magistrate; specifically, relator reiterates contentions that: (1) SERS was required to state the basis for its denial of relator's disability application in accordance with the dictates of State ex rel. Noll v. Indus. Comm. (1991),57 Ohio St.3d 203; (2) SERS abused its discretion in failing to assess relator's psychiatric condition; and (3) Dr. Claire Wolfe utilized an unlawful standard for determining disability.
 {¶ 4} Regarding relator's first objection, this court has previously held that "the statutes and rules which apply to SERS do not require that SERS state the basis for its denial of disability retirement."Smith v. School Emp. Retirement Sys., Franklin App. No. 06AP-987,2007-Ohio-3996, at ¶ 27, citing State ex rel. Lecklider v. School Emp.Retirement Sys., 104 Ohio St.3d 271, 2004-Ohio-6586, at ¶ 23. See, also,State ex rel. Pipoly v. State Teachers Retirement Sys.,95 Ohio St.3d 327, 2002-Ohio-2219, at ¶ 16 (declining to extend the requirements ofNoll to orders of the State Teachers Retirement System or the State Teachers Retirement Board).
 {¶ 5} Regarding relator's second objection, we agree with the magistrate's reasoning and analysis that respondent did not abuse its discretion in failing to schedule a psychiatric examination in the absence of relator's attending physician's certification of a psychiatric condition on that physician's report, and where relator never requested that SERS appoint a psychiatrist to examine for any condition set forth in additional exhibits submitted by relator. Finally, relator's third objection was fully considered by the *Page 3 
magistrate, and we agree with the magistrate that relator has failed to demonstrate that the September 25, 2003 report of Dr. Wolfe must be eliminated from consideration.
 {¶ 6} Following an examination of the magistrate's decision, as well as an independent review of the evidence, we overrule relator's objections to the magistrate's decision, finding that the magistrate sufficiently discussed and determined the issues raised by relator. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein, and deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
 BRYANT and FRENCH, JJ., concur. *Page 4 
 APPENDIX A MAGISTRATE'S DECISION Rendered August 16, 2007 IN MANDAMUS {¶ 7} In this original action, relator, Susan E. VanCleave, requests a writ of mandamus ordering respondent, School Employees Retirement System ("SERS"), to vacate its decision denying her R.C. 3309.39 application for disability retirement, and to enter a decision granting her disability retirement application.
Findings of Fact: *Page 5 {¶ 8} 1. On June 30, 2000, relator filed a disability retirement application on an SERS form. On her application, relator stated that she had been employed as a custodian by the Washington Local Schools located at Toledo, Ohio.
 {¶ 9} 2. With her application, relator submitted an Attending Physician Report on a SERS form. On the form, relator's treating physician, Richard A. Koepke, D.O., certified that relator "is physically and/or mentally incapacitated for a period of at least 12months and is unable to perform the duty for which [she was] formerly responsible as a school employee." (Emphasis sic.) The form asks the certifying physician to list the primary disabling conditions. In response, Dr. Koepke wrote: "[h]erniated disc L4-5, degenerative disc disease lumbar spine, bilateral sciatic neuralgia."
 {¶ 10} 3. The form also asks the physician to list any underlying conditions. In response, Dr. Koepke wrote: "Fibromyalgia."
 {¶ 11} 4. Relator's application for disability retirement benefits prompted SERS to schedule relator for an examination that was performed October 19, 2000 by Claire V. Wolfe, M.D. Following the examination, Dr. Wolfe issued a report stating:
 Susan [VanCleave] is a 46-year-old woman who has worked as a night custodian with the Washington Local Schools near Toledo. She was with the school district for 16 years and last worked in April 1997, stopping because of low back pain. Prior to being a custodian, Ms. [VanCleave] was a school bus driver. She switched to the night custodial job because it was fulltime, paid more and she could be her own boss. She did sometimes drive part-time on the weekends for the Lake Front School District while she was working as a custodian.
 Ms. [VanCleave] dates the onset of her problems to an injury at work in July 1996 when she fell off a stepladder. She states that she hit mostly on her right side and she has continued to hurt worse on that right side. She landed on her buttocks and "ripped both of my shins wide open." *Page 6 
Apparently, no sutures or surgery was necessary for her shin injuries although they "were all wrapped up." I mentioned to Ms. [VanCleave] that a review of those 1996 x-rays did not include any of her low back, just her pelvis and legs. She states she wished she had known enough to have them do those x-rays since her low back has only gotten consistently worse since that time. Ms. [VanCleave] states that her pain is "constant." It is described as both sharp and stabbing, as well as burning, and her diagram shows pain that starts in the right buttock and runs down the posterior lateral aspect of the thigh and leg to the foot. On her bad days, her pain may be a 10; on the best day, it might be a 5, and she thinks it averages about an 8. She had an MRI. She has been told that her diagnoses include a "herniated ruptured bulging disk, degenerative disk disease, something with the sciatic nerve and lumbosacral strain." She has had physical therapy. A TENS unit seemed to help some, but it was not approved by her insurance company. She has continued to use magnets, however. She wears them in her shoes, and that seems to help some pain that she has under her metatarsal arches. She has a magnet that she wears for her back at times and she has tried a magnet in her mattress. Traction during therapy made her much worse. Massage seemed to help. She has tried to do some back exercises consistently, sliding up and down the walls, and she tries to walk every other day a mile to a mile and a half. That may take her 30 to 45 minutes. She has also been diagnosed with fibromyalgia.
 Ms. [VanCleave] is not sure what makes her worse; she hurts all the time. She is somewhat better if she lies down and rests. She had one epidural injection. It made her worse and seemed to make the pain go from the right to the left. She has a history of irritable bowel syndrome for a few years. She has had migraine headaches since about 1990 and, when she has one, she will take Imitrex. Her current medications include Lodine XL 500 mg, two tablets daily; a water pill — probably Dyazide, although she did not bring her pills with her today; a Climara patch; Librax for her irritable bowel, anywhere from 1 to 4 tablets a day depending on her symptoms; atenolol for her blood pressure; Claritin and a decongestant for her allergies; and doxepin 50 mg at night for sleep.
 * * * *Page 7 
 Physical Examination
 On physical examination, Susan [VanCleave] is a pleasant, mildly anxious 46-year-old woman who appears her stated age. Her height is 5 feet 6-1/4 inches, her weight 177 pounds, and her blood pressure 125/80. Her station and gait were normal. She was able to stand on her heels and toes without assistance and she did eight repetitive pumps on each calf without difficulty. The neurologic exam in the lower extremities was normal with very brisk and symmetrical reflexes [3+] at the knees, adductors, medial hamstrings and ankles. Her legs are well muscled. There are no scars along the anterior shins. Calf circumferences are equal bilaterally. She is mildly tender along those anterior shins. She is not particularly tender with palpation of her plantar fascia or her heels today. She has no metatarsalgia. She has excellent bulk in her extensor brevis bilaterally. She had normal strength on manual muscle testing and that was done with good cooperation. Range of motion of her hips and knees was normal. Her straight-leg raising was unremarkable in the seated position to 70 degrees. Low back range of motion had good segmental motion on both left and right lateral bending. There were complaints of midline and right lumbar tenderness with extreme right bending. She actually felt better with extension, saying that the pressure was much less. She had good reversal of her lumbar lordosis on forward flexion.
 In the upper extremities, reflexes were brisk and symmetrical bilaterally and strength was normal. The cervical range of motion was full and fairly painless, although she had some left proximal trapezius discomfort with Spurling's maneuver to the left. Palpation revealed profound tenderness in the anterior chest bilaterally, moderate tenderness in the right lateral epicondyle and mild on the left, marked tightness in the left upper trapezius, mild tightness in the levators and cervical paraspinals. She was moderately tender in the lower back. She was severely tender with palpation in the right buttock, moderately on the left. Both greater trochanters were tender, as were the medial knees.
 Impression *Page 8 
 [One] Fibromyalgia syndrome.
 [Two] Lumbar degenerative disk disease without active radiculopathy.
 Recommendations
 Ms. [VanCleave] has MRI documentation of lumber degenerative disk disease with a bulge at L4-5 primarily to the left. Almost all of her symptoms are to the right. After several years of symptoms, she has no objective neurologic deficits. She has had normal electrodiagnostic studies in the past. Her low back symptoms are most compatible with her fibromyalgia diagnosis. I do not find anything on today's examination that would preclude her from continuing work as a custodian.
 {¶ 12} 5. On October 19, 2000, Dr. Wolfe completed a "Report of Medical Examination" on a SERS form. On the form, Dr. Wolfe certified that relator "is not physically and/or mentally incapacitated for a period of at least 12 months and is able to perform the duty for which [she is] responsible for as a school employee." (Emphasis sic.) On the form, for the "[m]edical [b]asis for [application," Dr. Wolfe listed four conditions: (1) "Herniated Disc L4-5," (2) "Degenerative Disc Disease — Lumbar Spine," (3) "Fibromyalgia" and (4) "Bilateral Sciatic Neuralgia."
 {¶ 13} 6. Pursuant to Ohio Adm. Code 3309-1-40(B), the school employees retirement board ("SERB") appoints physicians to a medical advisory committee ("MAC") and it appoints a chairman who acts as a medical advisor to SERB.
 {¶ 14} 7. During November 2000, three MAC physicians reviewed relator's application along with the medical evidence relator had submitted and the report from Dr. Wolfe. Each of the three MAC physicians authored a report addressed to Chairman Edwin H. Season, M.D. All three physicians concurred in Dr. Wolfe's conclusion that *Page 9 
relator is not incapacitated for a period of at least 12 months from her school custodian job.
 {¶ 15} 8. By letter dated November 15, 2000, Dr. Season informed SERB that MAC recommended that relator's disability retirement application be denied.
 {¶ 16} 9. By letter dated November 21, 2000, SERS informed relator that SERB had agreed with MAC's recommendation and had denied the application. The letter also informed relator of her right to appeal the decision.
 {¶ 17} 10. Pursuant to Ohio Adm. Code 3309-1-41, relator administratively appealed SERB's decision denying her application. Relator also requested a personal appearance.
 {¶ 18} 11. In support of her appeal, relator, through counsel, submitted a report dated February 15, 2001 from Dr. Koepke. In his report, Dr. Koepke opines "at this time I do not feel [patient] can return to her previous duties as janitor."
 {¶ 19} 12. By letter dated February 28, 2001, Dr. Season wrote:
 Information submitted on appeal was reviewed. The submissions do not constitute additional objective evidence as defined in Ohio Administrative Rule 3309-1-41. Based upon review of the entire file, including the submissions on appeal, the Medical Advisory Committee sees no basis to change the original decision to deny disability retirement and recommends that the appeal be denied.
 {¶ 20} 13. By letter dated March 20, 2001, SERS informed relator:
 All of the submitted evidence has been reviewed. Additional objective medical evidence in support of your application was not established and your request for a personal appearance has been denied. On March 15, 2001, the Retirement Board upheld their original decision to deny your request for disability retirement. All appeal rights in regard to this application have ceased. *Page 10 
 {¶ 21} 14. On September 30, 2002, relator filed a mandamus action in this court against SERS. That action was assigned case No. 02AP-1070. On January 13, 2003, relator filed a Civ.R. 41(A) notice of dismissal in 02AP-1070. Apparently, relator and SERS entered into an agreement that led to the dismissal.
 {¶ 22} 15. By letter dated February 27, 2003, SERS informed relator that her request for a personal appearance before the "Retirement Committee" had been granted.
 {¶ 23} 16. On May 29, 2003, relator personally appeared before the retirement committee as did her counsel and husband. At the hearing, relator submitted nine additional exhibits amounting to more than 80 pages. Counsel's cover letter, dated May 28, 2003, states:
 We believe that the medical evidence now on file from multiple specialists establishes clearly that the pain, decreased mobility and range of motion related to objectively established conditions of fibromyalgia, somatic dysfunction with myospasm and myositis, lumbar degenerative disc disease, neuropathic pain syndrome, and psychiatric conditions would preclude Ms. Van Cleave from performing her past employment position of school custodian, which job requirements involved occasional lifting up to 80 lbs and being on her feet for all or most of her work day.
 {¶ 24} 17. Among the exhibits submitted on May 29, 2003 was a report from treating psychiatrist, Melanie Thombre, M.D., dated April 10, 2003 stating:
 I [saw] your client, Susan Van Cleave today to evaluate her psychiatric status as related to work disability. I first evaluated her May 30, 1997, and she has subsequently continued therapy in my office[.] * * *
 The history that Ms. Van Cleave reports to me is also consistent with the ladder fall, and subsequent severe pain, and movement restriction being her primary problem. However, she does suffer from secondary mental disability. She describes a chronic irritability, mild anxiety and insomnia *Page 11 
that I believe would not be present if she did not have the chronic pain from the fall that she suffered. Further, she will require pain medications indefinitely, and is experiencing side effects from these, such as fatigue, sleepiness, and cognitive blunting. Were she not treated for the pain with an antidepressant, it is likely she would be suffering from more severe depression, since depression almost always accompanies chronic pain of the severity that she experiences. Her work related psychiatric diagnoses would therefore be Cognitive Disorder, NOS, (294.9), Sleep Disorder, (Insomnia) due to pain (780.52), and Mood Disorder due to chronic pain (293.83). She has had only a partial response to treatment, and is totally and permanently disabled for work as a school custodian, and as a bus driver. The primary basis for her disability is her pain, and decrease in mobility. Her psychiatric status, secondary depression and anxiety, contributes significantly to her disability because of cognitive dysfunction and interpersonal irritability. Also, due to her pain medications her alertness as a bus driver is compromised.
 {¶ 25} 18. Among the exhibits submitted on May 29, 2003 was a report from treating neurologist Allan G. Clague, M.D., dated April 16, 2003. In that report, Dr. Clague states:
 Her predominant medical problem at the present time is that of a chronic neuropathic pain syndrome which resulted from her fall while at work on 07-19-96 and is secondary to the injury sustained to the peripheral nervous system at that time. The most seriously injured portion of the peripheral nervous system is that of the lumbosacral plexuses; right and left. However, she has also sustained lesser injury to the brachial plexuses in the upper extremities, right greater than left. It is the injury to the peripheral nervous system which has resulted in her current disabling chronic neuropathic pain syndrome which was further aggravated and accelerated by her continuing to work following the initial acute injury. The type of accident which Susan described is consistent with the resultant injury and neurological sequelae. Her current neurological examination reveals the presence of sensory abnormalities.
 * * * *Page 12 
 Certainly on the basis of her clinical history and neurological examination Mrs. Susan E. Van Cleave (Crooks) is totally and permanently medically disabled from carrying out any form of gainful employment for which she is qualified by education, training and/or experience. * * *
 {¶ 26} 19. On July 21, 2003, MAC met in special conference to review the disability application in light of the additional medical evidence submitted by relator. Following the special conference, MAC recommended that relator undergo a reexamination to be performed by Dr. Wolfe.
 {¶ 27} 20. On September 25, 2003, relator was again examined by Dr. Wolfe, who reported:
 * * * I examined Mrs. VanCleave in October 2000 and felt that her symptoms and inability to work at that time were due to fibromyalgia with mild underlying degenerative disc disease.
 In the interim, Mrs. VanCleave has continued to have pain, has seen several physicians and had additional diagnostic tests. She has had several diagnoses consistent with fibromyalgia or somatic dysfunction. Her last MRI, in January 2001, was-according to her family physician-actually better than prior MRIs showing "healing retraction of the herniation area." In Dr. Koepke's letter to Mrs. VanCleave's attorney, George Fell, on May 26, 2003, [indeed, I have a copy of that MRI report] specifically notes no focal herniation or impingement from the "mild diffuse disc bulge" at L4-5. Mrs. VanCleave has also had an MRI of her right hip in September 2001 that was normal, and, in October 2001, she had a bone scan that was normal except for some mildly increased activity at the left L5 facet.
 Mrs. VanCleave is currently under the care of a clinical neurologist in Ann Arbor, Dr. All[a]n Clague, and I have a copy of his report stated [sic] September 4, 2003, plus his previous reports. Dr. Clague is treating Mrs. VanCleave for "neuropathic pain syndrome" that he has diagnosed as being secondary to brachial plexus and lumbosacral plexus injuries from her 1996 fall. I do not see any documentation in the *Page 13 
records sent to me to support a diagnosis of "reflex sympathetic dystrophy" or "complex regional pain syndrome Type I" which Dr. Clague's notes imply the patient has. The bone scan that is available is not noted to be a triple-phase bone scan which is usually used for the diagnosis of CRPS although, at this late date, it would be unlikely that a triple-phase bone scan would be expected to show abnormalities. I will address in the physical examination the absence of any long-term trophic changes which I looked for in Mrs. VanCleave.
 Mrs. VanCleave stated that her pain is better with her current medications that have been prescribed by Dr. Clague. He has encouraged her to be as active as she can be, but she stated she still "pays for it" if she overdoes what she can do. Even running the sweeper may set her pain off. Her husband offered that she tried to wash the car the other day and she was down for two days afterward. She tries to walk for exercise a couple of times a week. She will do a mile in 30 minutes or three miles within an hour. She stated she was very active prior to his injury and all of these problems, and "I want my life back." She was, in fact, fairly close to tears when she was talking about how she used to be and how she is now. She reported that she has seen and continues to see a psychologist periodically.
 * * *
 Physical Examination: Susan VanCleave was a pleasant 49-year-old woman who was well groomed, who had makeup on and looked quite good today in general. However, her affect was generally sad and moderately depressed. Her height was 66-1/2 inches and her weight 193 pounds. When I saw her in October 2000, she weighed 177 pounds. Today her blood pressure was 130/84. She sat comfortably in the chair while we were taking the history and her gait in the office was normal.
 I did a neurologic exam of both upper and lower extremities today. I found no asymmetry which Dr. Clague reported in his last exam. She had brisk and symmetrical reflexes at her biceps, triceps and brachioradialis. She has no median or ulnar intrinsic hand atrophy. Her hands were dry with no increased sweating. She had no allodynia on touch. She had no trophic changes of her digits: she had normal and sym- *Page 14 
metrical wrinkling bilaterally, good hair distribution on the dorsum of her hands and proximal digits and full flexion of all digits. Her hand temperature bilaterally was normal, warm and symmetrical today. She had no bluish discoloration nor any excessive whiteness. Manual muscle testing in both upper extremities was normal and symmetrical bilaterally. Her cervical range of motion was uncomfortable with all motions and most of the discomfort was posterior neck and the contralateral trapezius and SCM when she did rotation and Spurling's. Spurling's maneuver did not elicit any radicular symptoms. She had a noticeable fullness anteriorly consistent with a symmetrically enlarged thyroid. I palpated no masses within the thyroid and she apparently has had thyroid testing that was normal. She had no adenopathy in her cervical chains or in the supraclavicular area.
 I found no asymmetry in the lower extremities either. Her deep tendon reflexes today were 2-3+ and symmetrical at the knees, adductors, medial hamstrings and ankles. She had no circumferential difference in her calf measurements. She had excellent bulk in the extensor brevis bilaterally. Manual muscle testing of the toe extensors was done with good cooperation and was normal bilaterally. There was no evidence in her feet with removal of her socks of any asymmetry or sympathetic dysfunction. Specifically, her color and warmth was normal bilaterally. She had no allodynia. She had good hair distribution on her distal toes. She had full pulses behind her medial malleolus. She had no trophic changes in that her skin wrinkles were normal and she was able to flex and extend easily. Straight leg raising was unremarkable in the seated position to 70°. Examination of her low back revealed exquisite sensitivity to palpation in the lumbar paraspinals so that her knees almost buckled. She did lateral bending with good segmental motion to the right and some restricted segmental motion to the left although her complaints of discomfort were equal bilaterally. She had no discomfort with extension and stated it felt better to her. She had reversal of her lumbar lordosis on flexion.
 Palpation revealed the dramatic tenderness in the lumbar paraspinals, marked tenderness in the buttocks bilaterally and over the greater trochanters, marked tenderness in her upper trapezia, levators and cervical paraspinals bilaterally. Her mild scapular paraspinals were tight, particularly in the right, but she noted that they were not particularly tender *Page 15 
today. She was tender in her anterior chest wall bilaterally and over both lateral epicondyles.
 Impression: [One] Fibromyalgia syndrome. [Two] Depression and chronic anxiety. [Three] Lumbar degenerative disc disease without active radiculopathy. [Four] No evidence of CRPS I
 Plan: I have reviewed all of the information on Mrs. VanCleave. I have reviewed Dr. Clague's opinions and those of the other physicians who have been caring for her. I have reviewed her hearing before the board. Regardless of what people are calling it, I believe that most of the physicians feel that Mrs. VanCleave has a chronic pain disorder that is primarily myofascial. There is nothing in the documentation to support reflex sympathetic dystrophy/complex regional pain syndrome. There was nothing from the time of injury on that I have seen documented that would suggest that she had brachial or lumbar plexopathies.
 People with fibromyalgia are, in fact, genuinely distressed. The question of disability is more difficult to assess because it is a subjective one. I do not believe the fibromyalgia is functionally disabling, even for Mrs. VanCleave's job as a custodian. However, every physician that she has seen has told her that she cannot return to that, that her pain complaints will only be worse with that type of activity and it would be therefore very difficult, I think, for her to believe that she could return to such activity even if she went through a work hardening program. It is difficult when you are the treating physician to be "objective" and not take the subjective pain into consideration. However, based on my review of all the data and the examinations, I do not believe there are objective abnormalities that would preclude Mrs. VanCleave's work.
(Emphasis sic.)
 {¶ 28} 21. During late October and early November 2003, MAC reviewed Dr. Wolfe's September 25, 2003 report.
 {¶ 29} 22. On October 27, 2003, MAC member Timothy J. Fallon, M.D., wrote: *Page 16 
 In order to make a more complete determination of her status at this time, a medical evaluation was obtained and an independent medical opinion was obtained from Dr. Claire Wolfe on September 25, 2003. Dr. Wolfe concluded that she was not incapacitated for return to her work activity and indicated diagnoses of depression, anxiety, fibromyalgia, and lumbar degenerative disk disease as being present conditions.
 My medical opinion at this time is that Susan VanCleave is able to resume and continue in her work activity as a custodian.
 {¶ 30} 23. On October 29, 2003, MAC member Charles F. Wooley, M.D., wrote:
 Dr. Claire Wolfe, MD, Physical Medicine, 25 September 2003 performed a careful clinical re-evaluation. Diagnosis: Fibromyalgia syndrome; Lumbar degenerative disc disease without active radiculopathy; No evidence of reflex sympathetic dystrophy/complex regional pain syndrome; no evidence of brachial or lumbar plexopathies. Following extensive discussion and rationale, Dr. Wolfe concluded there were no objective abnormalities that would preclude return to work.
 Upon review of the entire disability retirement application, I did not find additional objective medical information submitted on appeal to support permanent disability. It is my opinion that Susan E. Van Cleave is not permanently incapacitated for the performance of her usual duties as a Custodian.
 {¶ 31} 24. On November 6, 2003, MAC member Barry Friedman, M.D., wrote:
 Dr. Wolfe had seen Ms. VanCleave originally in October 2000 at which time her diagnosis was that of fibromyalgia accompanied by underlying degenerative disc disease. Dr. Wolfe reviewed Dr. Cl[a]gue's report and conducted her own examination. Dr. Wolfe found no evidence of reflex asymmetry of atrophy at the hands. She found no evidence to support a chronic regional pain syndrome/reflex sympathetic dystrophy. She found no evidence of a radiculopathy. Dr. Wolfe noted multiple sites of "dramatic tenderness" all consistent with a diagnosis of fibromyalgia. Dr. Wolfe felt that Ms. VanCleave's pain syndrome was *Page 17 
"primarily myofacial with no documentation to support reflex sympathetic dystrophy or brachial/lumbar plexopathies." Based on her clinical findings and the absence of other documentation/objective evidence of a specific neurologic disorder, Dr. Wolfe did not find evidence of permanent disability. I concur with her opinion.
 {¶ 32} 25. By letter dated November 17, 2003, Dr. Season informed SERB:
 The Medical Advisory Committee reviewed the submissions on appeal including all evidence and testimony in relation to Ms. VanCleave's personal appearance. There was a lack of consensus, so a special conference was requested. On the basis of this conference, the Medical Advisory Committee recommended that a subsequent examination be performed. Upon review of all medical information submitted, the Medical Advisory Committee recommends that the original decision to deny disability retirement be upheld and that the appeal be denied.
 {¶ 33} 26. By letter dated November 21, 2003, SERS informed relator:
 On November 19, 2003, the Retirement Board upheld their original decision to deny your disability retirement application. All appeal rights in regard to this application have ceased.
 {¶ 34} 27. On December 8, 2006, relator, Susan E. VanCleave, filed this mandamus action.
Conclusions of Law: {¶ 35} Three issues are presented: (1) whether this court should compel respondent to comply with the requirements of State ex rel. Nollv. Indus. Comm. (1991), 57 Ohio St.3d 203, in rendering its decision on relator's application for disability retirement benefits; (2) whether respondent abused its discretion in failing to have relator undergo a psychiatric evaluation; and (3) whether Dr. Wolfe's September 25, 2003 report must be eliminated from evidentiary consideration by respondent. *Page 18 
 {¶ 36} The magistrate finds: (1) Noll is inapplicable to respondent's decision; (2) respondent did not abuse its discretion in failing to schedule relator for a psychiatric evaluation; and (3) Dr. Wolfe's September 25, 2003 report cannot be eliminated from evidentiary consideration.
 {¶ 37} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 38} Turning to the first issue, in State ex rel. Pipoly v. StateTeachers Retirement Sys., 95 Ohio St.3d 327, 2002-Ohio-2219, the court rejected the proposition that Noll is applicable to decisions of the State Teachers Retirement System ("STRS"). The Pipoly court held that STRS had no duty to explain its decisions granting or denying disability retirement benefits because no statute or administrative rule requires such duty. The Pipoly court recognized that in State ex rel. Ochs v.Indus. Comm. (1999), 85 Ohio St.3d 674, it had extended Noll to apply to a decision of the Ohio Bureau of Workers' Compensation despite the absence of any statutory duty imposing those requirements on the bureau.
 {¶ 39} Citing this court's decision in State ex rel. Copeland v.School Emp. Retirement Sys. (Aug. 5, 1999), Franklin App. No. 98AP-1173, appeal dismissed based on mootness (2000), 88 Ohio St.3d 1507, thePipoly court noted that this court similarly rejected a request to extend Noll to disability determinations of SERS.
 {¶ 40} The Pipoly court concluded:
 Therefore, while extending Noll to STRS and [State Teachers Retirement Board] determinations may be tempting based on policy considerations, see Ochs * * * at 675-676, * * * we will not impose the Noll requirements in the absence of a statutory duty or a comparable need for these *Page 19 
requirements in cases other than workers' compensation cases. * * *
Id. at ¶ 22.
 {¶ 41} Here, invoking the principle of "due process" under the federal and state constitutions, relator asks this court to refuse to followPipoly and Copeland and to order respondent to follow Noll in rendering a new decision on relator's application. Because this court is bound by the Pipoly decision, this court must decline relator's invitation to, in effect, overrule Pipoly.
 {¶ 42} The second issue, as previously noted, is whether respondent abused its discretion in failing to have relator undergo a psychiatric evaluation.
 {¶ 43} At the May 29, 2003 hearing before the retirement committee, as previously noted, relator submitted nine additional exhibits. Among those exhibits was the April 10, 2003 report of the treating psychiatrist, Dr. Thombre, who wrote that relator's "psychiatric status, secondary to depression and anxiety, contributes significantly to her disability."
 {¶ 44} According to relator, submission of Dr. Thombre's report imposed a duty upon respondent to have her undergo a psychiatric (or psychological) evaluation by a competent disinterested physician selected by respondent. The magistrate disagrees.
 {¶ 45} R.C. 3309.39(B) provides that an application for disability retirement "shall be made on a form provided by the retirement board." The Attending Physician Report which is part of the disability application, specifically provides:
 * * * The Retirement Board requires a general summary of the applicant's physical and/or mental condition as a guide in selection of the medical examiner as required by law (O.R.C. 3309.39). The examiner will only evaluate for the medical condition(s) that are included in your report. Please list only the medical condition(s) that are considered disabling. * * * *Page 20 
 {¶ 46} Significantly, in support of her application, Dr. Koepke certified on the attending physician's report that the disabling conditions are "[h]erniated disc L4-5, degenerative disc disease lumbar spine, bilateral sciatic neuralgia." Dr. Koepke listed "fibromyalgia" as the underlying condition.
 {¶ 47} Based upon Dr. Koepke's certification as to the disabling and underlying conditions, SERS appointed Dr. Wolfe to examine relator.
 {¶ 48} Presumably, had Dr. Koepke certified a psychological or psychiatric condition as a disabling condition or an underlying condition, respondent would have had relator evaluated by a psychiatrist or a psychologist. Clearly, respondent cannot be found to have abused its discretion by failing to have relator examined by a psychiatrist or a psychologist in the absence of Dr. Koepke's certification of a psychiatric condition on the attending physician's report.
 {¶ 49} Moreover, as evidenced by counsel's cover letter of May 28, 2003 and the transcript of the May 29, 2003 hearing, relator never requested that SERS appoint a psychiatrist to examine for any condition addressed in the additional exhibits submitted on May 29, 2003. Thus, even if SERS had the discretion to have relator additionally evaluated for a psychiatric condition beyond May 29, 2003, relator never asked respondent to exercise such discretion. Under such circumstances, relator cannot argue here that respondent abused its discretion in failing to schedule a psychiatric examination.
 {¶ 50} The third issue, as previously noted, is whether Dr. Wolfe's September 25, 2003 report must be eliminated from evidentiary consideration.
 {¶ 51} In this regard, relator criticizes the following portion of Dr. Wolfe's September 25, 2003 report: *Page 21 
 * * * It is difficult when you are the treating physician to be "objective" and not take the subjective pain into consid eration. However, based on my review of all the data and the examinations, I do not believe there are objective abnor malities that would preclude Mrs. VanCleave's work.
 According to relator:
 * * * Dr. Wolfe's September 25, 2003 report admits that Relator has a chronic pain disorder which genuinely distresses people with fibromyalgia. However, Dr. Wolfe seems to believe that because the pain levels are subjective, she is unable to objectively verify the level of severity of the pain[.] * * *
 * * *
 It would appear that Dr. Wolfe's standard of requiring "objective abnormalities" is not supported by the legislation which only requires that the member be mentally or physically incapacitated for the performance of his or her last assigned primary duty and that the condition be permanent or presumed to be permanent for twelve continuous months following the filing of the application. No requirement for objective, to the exclusion of subjective, aspects of disability are required.
Relator's brief, at 32-33. (Emphasis sic.)
 {¶ 52} It is inappropriate for this court to entertain this type of argument in a mandamus action. This type of argument asks this court to second-guess the medical expertise of Dr. Wolfe, which this court should decline to do. See State ex rel. Young v. Indus. Comm. (1997),79 Ohio St.3d 484, and [State ex rel.] Duncan v. Admr., Ohio Bureau of Workers'Comp., Franklin App. No. 03AP-1234, 2004-Ohio-5542.
 {¶ 53} Thus, relator has not shown that Dr. Wolfe's September 25, 2003 report must be eliminated from evidentiary consideration. *Page 22 
 {¶ 54} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 *Page 1